IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-92

No. 305A21

Filed 15 July 2022

IN THE MATTER OF: R.L.R.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 28 May 2021 by Judge D. Brent Cloninger in District Court, Cabarrus County. This matter was calendared for argument in the Supreme Court on 1 July 2022, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*William L. Esser, IV, for Guardian ad Litem, and E. Garrison White for petitioner-appellee Cabarrus County Department of Human Services.*

*Christopher M. Watford for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Kayla H. appeals from an order entered by the trial court terminating her parental rights in her daughter, R.L.R.[1] After careful consideration of respondent-mother's challenges to the trial court's termination order in light of the

---

[1] R.L.R. will be referred to throughout the remainder of this opinion as "Rachel," which is a pseudonym used to protect the identity of the juvenile and for ease of reading.

record and the applicable law, we conclude that the trial court's order should be affirmed.[2]

## I.     Background

On 2 April 2019, the Cabarrus County Department of Human Services filed a verified juvenile petition alleging that Rachel was a neglected and dependent juvenile and obtained the entry of an order placing her in nonsecure custody.  In its petition, DHS described its interactions with Rachel's family following the receipt of a child protective services report on 26 November 2018 concerning a "nasty black, blue and red bruise on the left side of [Rachel's] face covering her lip, neck, jaw, and face[.]" Although the initial report indicated that Rachel had sustained this bruise as the result of a fall that had occurred while she was in her stepfather's care, Rachel stated during an appointment at the Child Advocacy Center that "her daddy pushed her[,]" an assertion that caused the Child Advocacy Center staff to reach the conclusion that Rachel's "injuries were from non-accidental trauma" and to become concerned about the possibility that Rachel had been subjected to physical abuse.  After the maternal grandmother had been identified as a temporary safety provider, Rachel was placed in the maternal grandmother's care pursuant to a safety agreement stating that

---

[2] Although the trial court terminated the parental rights of Rachel's father, Ricky R., as well, the father did not note an appeal to this Court from the trial court's termination order.  As a result, we will refrain from discussing the facts relating to the father's situation in any detail in this opinion.

respondent-mother could only have supervised contact with Rachel and that the stepfather could not have any contact with Rachel at all.

DHS also alleged that the stepfather had been charged with committing felony and misdemeanor drug offenses on 16 December 2018 and that respondent-mother had reported on 17 December 2018 that she had used cocaine and marijuana while Rachel had been temporarily placed with the maternal grandmother. DHS asserted that, on 19 December 2019, "[t]he case was substantiated for physical abuse and neglect due to concerns of improper supervision, substance abuse, and injurious environment" and transferred it to the in-home services unit. Although respondent-mother missed an initial child and family team meeting that was held on 14 January 2019, she attended a rescheduled meeting that was held on 25 January 2019, at which time she agreed to a case plan that required her to participate in parenting education and demonstrate the skills that she had learned in disciplining, supervising, and protecting Rachel; complete a substance abuse assessment and comply with any resulting recommendations; submit to random drug screening within two hours after having been requested to do so; and sign releases authorizing the provision of information to DHS.

DHS further alleged that, while the family was receiving in-home services, the agency had received a second child protective services report on 29 January 2019 indicating that Rachel had been in the care of respondent-mother rather than the

maternal grandmother and that the respondent-mother was taking Rachel to the stepfather's home. DHS asserted that it had received a third child protective services report on 14 March 2019 indicating that there were drugs in the family home and that respondent-mother and the stepfather had "fallen asleep (passed out) due to possible heroin use" while Rachel was in the home and unsupervised. According to DHS, respondent-mother had failed three drug screens in March, having tested positive for the presence of methamphetamine, opiates, amphetamines, and marijuana.

¶ 5         Finally, DHS alleged that, despite the fact that respondent-mother, the stepfather, and the maternal grandmother had repeatedly denied that they had violated the safety agreement, the agency remained concerned that Rachel was having unauthorized contact with respondent-mother and the stepfather. DHS alleged that its concerns had been validated on 1 April 2019, when Rachel was discovered with respondent-mother and the stepfather at a time when the maternal grandmother was absent.

¶ 6         Within a week after the filing of the juvenile petition, DHS sought leave to amend its petition for the purpose of including additional factual allegations concerning information of which it had been unaware at the time at which the initial petition had been filed. According to the additional allegations set out in the amended petition, the stepfather's probation officer had made an unannounced visit to the

home in March 2019; the probation officer had discovered Rachel, respondent-mother, and the stepfather at the residence during his visit; the stepfather had informed the probation officer that Rachel had been placed back in the family home; and an incident involving domestic violence between the stepfather and respondent-mother in Rachel's presence had occurred on 24 March 2019.

¶ 7 On 25 July 2019, Judge Christy E. Wilhelm entered an order determining that Rachel was a neglected and dependent juvenile based, in part, upon respondent-mother's stipulation to the making of findings of fact that were consistent with the allegations that had been made in the amended petition. In addition, Judge Wilhelm ordered that Rachel remain in DHS custody, provided for weekly supervised visitation between respondent-mother and Rachel for a period of one hour, and authorized DHS to expand the amount of time within which respondent-mother was allowed to visit with Rachel as the proceeding progressed. Similarly, Judge Wilhelm ordered respondent-mother to obtain a substance abuse assessment and to comply with any resulting recommendations; to submit to random drug screens; to obtain a comprehensive clinical assessment following a period of sobriety and comply with any resulting recommendations; complete parenting education; adhere to the weekly visitation plan; attend Rachel's medical and dental appointments and educational meetings; obtain and maintain housing that was appropriate for herself and Rachel for a minimum of six months; provide verification that she had sufficient income to

provide for herself and Rachel; provide financial support for Rachel; sign any information releases requested by DHS; and maintain bi-weekly contact with the social worker. Finally, Judge Wilhelm established a primary permanent plan of reunification for Rachel, with a secondary plan of legal guardianship.

¶ 8 After a permanency planning hearing held on 12 March 2020, Judge Wilhelm entered an order on or about 2 April 2020 finding that respondent-mother had failed to make adequate progress toward correcting the conditions that had led to Rachel's removal from the family home within a reasonable period of time and that the conditions that had resulted in Rachel's placement in DHS custody continued to exist because respondent-mother had not participated in substance abuse and parenting education-related services and had failed to consistently visit with Rachel. As a result, Judge Wilhelm ordered that Rachel's primary permanent plan be changed to one of legal guardianship, with a secondary plan of reunification. In addition, Judge Wilhelm reduced the amount of time during which respondent-mother was entitled to visit with Rachel to a period of one hour every other week and ordered respondent-mother to confirm her attendance at least two hours prior to each visit. According to Judge Wilhelm, while Rachel was doing well in her current placement, her foster parents were not interested in serving as a permanent placement for her. On the other hand, respondent-mother's second cousin had expressed an interest in providing Rachel with a permanent placement and was the subject of a home study

that was in the process of being performed. As a result, Judge Wilhelm ordered that Rachel be placed with the maternal second cousin in the event that a favorable result was reported at the conclusion of the pending home study.

¶ 9 After another permanency planning hearing held on 11 June 2020, the trial court entered an order on 2 July 2020 finding that the maternal second cousin's home had been approved at the conclusion of the home study and that Rachel had been transitioned to this relative placement on 25 May 2020. In addition, the trial court clarified that Rachel's primary permanent plan involved legal guardianship with a relative. The trial court found that respondent-mother had not visited with Rachel during the past ninety days and that her failure to visit with Rachel had negatively affected the child. As a result, the trial court ordered that respondent-mother's visits with Rachel be terminated until respondent-mother had made herself available to the court and had begun to actively engage in complying with the requirements of her case plan.

¶ 10 In an order entered on 20 October 2020 following a 10 September 2020 permanency planning hearing, Judge Wilhelm found that respondent-mother had continued to make no progress in complying with the requirements of her case plan and that the maternal second cousin had expressed a desire to adopt Rachel. As the result of respondent-mother's failure to make satisfactory progress in addressing the conditions that had led to Rachel's removal from the family home and Rachel's need

for a safe, permanent home within a reasonable period of time, Judge Wilhelm changed Rachel's primary permanent plan to one of adoption and ordered DHS to seek the termination of respondent-mother's parental rights in Rachel.

¶ 11        On 11 December 2020, DHS filed a motion in which it alleged that respondent-mother's parental rights in Rachel were subject to termination based upon neglect pursuant to N.C.G.S. § 7B-1111(a)(1), willful failure to make reasonable progress toward correcting the conditions that had led to Rachel's removal from the family home pursuant to N.C.G.S. § 7B-1111(a)(2), willful failure to pay a reasonable portion of the cost of the care that Rachel had received while in DHS custody pursuant to N.C.G.S. § 7B1111(a)(3), and dependency pursuant to N.C.G.S. § 7B-1111(a)(6) and that the termination of respondent-mother's parental rights would be in Rachel's best interests.   During the pendency of the termination motion, the maternal second cousin had a change of heart concerning her interest in adopting Rachel, resulting in Rachel's placement in foster care.  After a hearing held on 25 March 2021, the trial court entered an order on 28 May 2021 in which it concluded that respondent-mother's parental rights in Rachel were subject to termination on the basis of each of the grounds for termination alleged in the termination motion, *see* N.C.G.S. § 7B-1111(a)(1)–(3), (6) (2021), and that the termination of respondent-mother's parental rights would be in Rachel's best interests.  Respondent-mother noted an appeal to this Court from the trial court's termination order.

## II.    Analysis

¶ 12      In seeking relief from the trial court's termination order before this Court, respondent-mother argues that the trial court erred by concluding that her parental rights in Rachel were subject to termination and that the termination of her parental rights would be in Rachel's best interests. We will address each of respondent-mother's challenges to the trial court's termination order in the order in which she has presented them in her brief.

### A. Adjudication of Grounds

¶ 13      "In conducting a termination of parental rights proceeding, the trial court begins by determining whether any of the grounds for termination delineated in N.C.G.S. § 7B-1111(a) exist." *In re A.E.*, 379 N.C. 177, 2021-NCSC-130, ¶ 13 (citing N.C.G.S. § 7B-1109). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, (2019) (quoting N.C.G.S. § 7B-1109(f)). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

¶ 14      "We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *Id.* at 392 (quoting *In re Montgomery*, 311

N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citing *In re Moore*, 306 N.C. 394, 403–04 (1982)). "Unchallenged findings are deemed to be supported by the evidence and are binding on appeal." *In re R.G.L.*, 379 N.C. 452, 2021-NCSC-155, ¶ 12. "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 15        A parent's parental rights in a child are subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the trial court determines that the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2021). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent . . . [d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(a), (e) (2021).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed

circumstances occurring between the period of past neglect
and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up). "[E]vidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect." *In re O.W.D.A.*, 375 N.C. 645, 648 (2020). "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)). On the other hand, "a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020)). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 26 (quoting *In re Ballard*, 311 N.C. 708, 715 (1984)).

¶ 16        The trial court concluded in its termination order that respondent-mother's parental rights in Rachel were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) "in that [respondent-mother] . . . ha[s] caused [Rachel] to be neglected, as defined in [N.C.G.S.] § 7B-101(a)(15) in that [Rachel] lives in an environment injurious to [her] welfare, [respondent-mother] . . . does not provide proper care, supervision, or discipline, . . . and . . . there is a reasonable probability that such will

continue for the foreseeable future."[3] In view of the fact that Rachel had been out of respondent-mother's custody for an extended period of time, the trial court based its determination that respondent-mother's parental rights in Rachel were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) on the theory that Rachel had been neglected at an earlier period of time and that she was likely to be subject to further neglect in the event that she was returned to respondent-mother's care. In support of this set of determinations, the trial court found as a fact that:

> 10. On or about July 25, 2019, at an adjudication hearing, after stipulations and consent by the parties, arguments of counsel, and evidence presented, the Court found by clear, cogent and convincing evidence that [Rachel] was neglected and dependent.
>
> 11. . . . [A] case plan was established for [respondent-mother] . . . to address the issues which led to the removal of [Rachel] from the home.
>
> 12. . . . [T]he Court has consistently reviewed [respondent-mother's] progress towards the case plan and [respondent-mother's] efforts to alleviate or remedy the issues which led to the removal of [Rachel] from the home and regain custody of [Rachel]. [Respondent-mother] . . . ha[s] not made reasonable and adequate efforts towards the case plan to ensure the safety of the juvenile. There is a high probability of repetition of neglect of [Rachel] if [she] were returned to [respondent-mother's] . . . custody based upon [her] lack of commitment towards working on the[]

---

[3] Although the trial court also concluded that respondent-mother's parental rights in Rachel were subject to termination on the basis of neglect by abandonment, we need not determine whether the trial court erred in reaching this conclusion in light of our determination that the trial court did not err in concluding that Rachel had been neglected in the past and that it was likely that Rachel would be neglected in the future in the event that she was returned to respondent-mother's care.

case plan[]. The concerns at the time of removal are still a concern, and there have not been any sustained behavior changes shown by [respondent-mother] . . . .

. . . .

14.    [Respondent-mother] has made minimal progress on her case plan to alleviate the issues which brought [Rachel] into care. She waited until after the TPR was filed to start working any of her services. Prior to that, [respondent-mother] had not completed any tasks of her case plan in nineteen (19) months. [Respondent-mother's] lack of progress extends beyond substance abuse treatment and concerns with her ability to maintain sobriety into parenting education and visitation with [Rachel] as well. [Respondent-mother] has missed several scheduled appointments that prevent her from receiving ongoing services from her provider, that [respondent-mother] had acknowledged would be very beneficial for her obtaining sobriety and addressing [DHS's] concerns. [Respondent-mother] has made no behavioral changes necessary to ensure [Rachel's] safety.

15.    Although [respondent-mother] did attend some assessments in March 2019[,] she did not follow through with recommendations and treatment, including life skills, parenting, individual counseling and intensive outpatient substance abuse program until almost two years later. She did not complete any of these services, but instead did another assessment in September 2020. [Respondent-mother] was consistently testing positive for illegal substances during 2019. During 2020, she did not submit to screens upon request. She did not start submitting to screens again until 2021.

16.    [Respondent-mother's] visits were discontinued in June 2020 due to her lack of consistent participation and the adverse effects of missing scheduled visits had on [Rachel's] emotional wellbeing. [Respondent-mother] was not engaging in visitations prior to visits being suspended and [her] participation in scheduled visits with [Rachel]

has been inconsistent throughout the entirety of the case.
[Respondent-mother's] failure to comply with her visitation
plan and case plan suggests that providing safe and
appropriate care is not a priority for [her].

17.    [Respondent-mother] has never maintained suitable
housing throughout the life of this case.  Just in January
2021[, she] got a place to stay but has never provided a
lease.  Similarly, her employment has not been stable.  She
has bounced around to different jobs over the last few
months.  Transportation is also not consistent, and she
does not have an active driver's license.

18.    . . . . [Respondent-mother] is still married to [the
stepfather], who is currently incarcerated in Kentucky.
Throughout the life of the underlying case, [respondent-
mother] has chosen [the stepfather] and her relationship
with him over [Rachel].

. . . .

32.    [Respondent-mother] . . . ha[s] not remedied any of
the conditions that led to [Rachel's] removal.  [Respondent-
mother] . . . ha[s] not shown any behavior changes, or the
ability to care for [Rachel's] health, safety, and welfare.

¶ 17    Although respondent-mother "concedes and stipulates to a past adjudication of

neglect," she contends that the "trial court cannot support its conclusion of likely

future neglect."[4]  More specifically, respondent-mother argues that certain of the trial

court's findings of fact relating to this issue lack sufficient evidentiary support and

---

[4] Although the trial court stated that there "is a high probability of repetition of
neglect if [Rachel] were returned to [respondent-mother's] . . . custody" in Finding of Fact No.
12, this determination is more properly classified as a conclusion of law and will be treated
as such for purposes of our review of the trial court's termination order in this case.  *See In
re D.L.A.D.*, 375 N.C. 565, 571 (2020) (citing *In re J.O.D.*, 374 N.C. 797, 807 (2020)).

that other findings fail to accurately reflect the changes in respondent-mother's circumstances that had occurred following Rachel's removal from the family home.[5]

¶ 18    As an initial matter, respondent-mother argues that the first portion of Finding of Fact No. 17, which states that respondent-mother "never maintained suitable housing," lacks sufficient evidentiary support.  In support of this contention, respondent-mother directs our attention to the social worker's testimony that respondent-mother had housing with working utilities and a bedroom that was available for Rachel's use at the time of the termination hearing.  Respondent-mother's argument ignores the trial court's determination in the second sentence of Finding of Fact No. 17 that, "[j]ust in January 2021[, respondent-mother] got a place to stay but has never provided a lease."  When read in context, Finding of Fact No. 17 indicates that, while the trial court considered respondent-mother's claim to have obtained adequate housing, it also noted that she had failed to verify that she had actually done so.  As a result, we hold that Finding of Fact No. 17 is supported by the social worker's testimony that respondent-mother had provided her current address in late January 2021, that the social worker had been able to visit the apartment on

---

[5] In view of the fact that a number of the findings of fact that are addressed in respondent-mother's brief as having been made in error are not necessary to the trial court's determination that respondent-mother's parental rights in Rachel were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1), we will refrain from discussing the arguments that respondent-mother has made with respect to those findings in this opinion.

24 March 2021, and that respondent-mother had failed to provide a copy of her lease to DHS despite the social worker's request that she do so.

¶ 19    Although respondent-mother does not argue that the trial court erred by stating in Finding of Fact No. 17 that her employment situation had lacked stability, she does assert that she had made progress in seeking and obtaining employment. A careful review of the record satisfies us that the trial court's findings that respondent-mother's "employment has not been stable" and "[s]he has bounced around to different jobs over the last few months" are supported by testimony provided by both the social worker and respondent-mother herself concerning the nature and extent of respondent-mother's employment. For that reason, we hold that respondent-mother's challenge to the trial court's employment-related findings in Finding of Fact No. 17 lacks merit.

¶ 20    Next, respondent-mother argues that the trial court erred in making Finding of Fact No. 18, which states that she had chosen her relationship with the stepfather over her ability to regain the right to parent Rachel. As an initial matter, respondent-mother concedes that her case plan required her to sever her ties with the stepfather and has failed to argue that the trial court's finding that she remained married to the stepfather lacked sufficient evidentiary support. In addition, we note that the social worker testified that DHS remained concerned that respondent-mother's continued marriage to the stepfather created the possibility that Rachel would have contact

with him in the future even though his actions had contributed to Rachel's removal from the family home and even though the stepfather had not made any progress toward satisfying the requirements of his own case plan. On the other hand, the record does not contain any evidence tending to show that any relationship between respondent-mother and the stepfather continued to exist other than the fact that they remained married to each other and does contain evidence tending to show that the stepfather had been incarcerated since April 2019, that respondent-mother had reported shortly after the underlying juvenile case had commenced that she had not been in contact with the stepfather, and that respondent-mother claimed that the stepfather had told her "to move on." As a result, while the record does support the trial court's finding that respondent-mother remained married to the stepfather, it does not support the trial court's finding that respondent-mother had chosen her relationship with the stepfather over the chance to regain the ability to parent Rachel "[t]hroughout the life of the underlying case." For that reason, we will disregard the relevant portion of Finding of Fact No. 18 in determining whether the trial court erred in concluding that respondent-mother's parental rights in Rachel were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1). *See In re L.H.*, 378 N.C. 625, 2021-NCSC-110, ¶ 14 (disregarding factual findings not supported by the record).

¶ 21        Similarly, respondent-mother argues that the trial court erred in making Finding of Fact Nos. 12, 14, and 32 to the extent that these findings reflect a determination that respondent-mother had failed to exhibit the behavioral changes necessary to ensure Rachel's safety and welfare. Although respondent-mother acknowledges that she had failed to make progress toward satisfying the requirements of her case plan for a substantial period of time, she asserts that she "changed her situation substantially" in the months preceding the date upon which the termination hearing was held by completing substance abuse group therapy and a Parenting Lifeskills course and obtaining a comprehensive clinical assessment. For that reason, respondent-mother contends that the trial court failed to adequately account for the evidence relating to the changes that had occurred in her circumstances as of the date of the termination hearing. We do not find this argument persuasive.

¶ 22        As an initial matter, we note that the trial court's unchallenged findings of fact reflect that it did consider evidence concerning the progress that respondent-mother had made in satisfying the requirements of her case plan between the filing of the termination motion on 11 December 2020 and the holding of the termination hearing on 25 March 2021. The trial court stated in the unchallenged portion of Finding of Fact No. 14 that respondent-mother had "waited until after the [termination motion] was filed to start working on any of her services" and that, "[p]rior to that, . . . [she]

had not completed any tasks of her case plan in nineteen (19) months." In addition, the trial court stated in unchallenged Finding of Fact No. 15 that, although respondent-mother "did attend some assessments in March 2019, she did not follow through with recommendations and treatment, including life skills, parenting, individual counseling and intensive outpatient substance abuse program until almost two years later." These unchallenged findings of fact, which are binding upon us for purposes of appellate review, *see In re R.G.L.*, 2021-NCSC-155, ¶ 12, demonstrate that the trial court knew of and considered the portions of the record indicating that respondent-mother had made some progress in satisfying the requirements of her case plan during the period of time leading up to the holding of the termination hearing.

¶ 23        In addition, as the Court of Appeals had noted, a "case plan is not just a checklist," with parents being required to "demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors." *In re Y.Y.E.T.*, 205 N.C. App. 120, 131(2010). In this case, both the record evidence and the trial court's unchallenged findings of fact show that, while respondent-mother had engaged in substance abuse and parenting education services in the months preceding the termination hearing, she had failed to demonstrate that sustained behavioral change of the type necessary to ensure Rachel's safety and welfare had actually occurred. For example, the trial court found in Finding of Fact

No. 15 that, after testing positive for illegal substances during 2019, respondent-mother had refused to submit to drug screens upon request during 2020 and did not resume submitting to such testing until 2021, with her participation in the drug screening process for a period of three months prior to the termination hearing following nineteen months of non-compliance being insufficient to establish that sustained behavioral change had occurred.

¶ 24        Similarly, while the record contains evidence tending to show that respondent-mother completed a Parenting Lifeskills course in December 2020, the trial court stated in Finding of Fact No. 16 that respondent-mother's visits with Rachel had been discontinued in June 2020 because of her inconsistent attendance and the negative effect that her failure to attend scheduled visitation sessions had had on Rachel. Although respondent-mother argues that she did not have a reasonable opportunity to demonstrate that her methods of parenting Rachel had changed because the trial court had conditioned the reinstatement of her visitation with Rachel in February 2021 upon the making of a recommendation that such visits be resumed by Rachel's therapist and because DHS had failed to find a new therapist for Rachel by the time of the termination hearing and cites the decision of the Court of Appeals in *In re Shermer*, 156 N.C. App. 281, 288 (2003), for the proposition that a parent's failure to comply with a case plan provision does not support a decision to terminate that parent's parental rights in the event that the parent has not had adequate time to

make the required amount of progress, respondent-mother overlooks the fact that, in *Shermer*, the parent had only had two months within which to attempt to satisfy the requirements of the case plan prior to the termination hearing, *id.*, while, in this case, respondent-mother had had almost two years to satisfy the requirements of her case plan prior to the date of the termination hearing and had failed to fully comply with any of the plan's provisions during that time. In addition, unlike the situation at issue in *Shermer*, respondent-mother had been allowed to visit with Rachel until June 2020, when visitation between the two of them had been discontinued because of respondent-mother's inconsistent attendance and the negative impact that respondent-mother's failures to visit with Rachel had had on the child, with respondent-mother having failed to contact DHS for the purpose of requesting a resumption of her visits with Rachel until November 2020. As a result, respondent-mother's inability to demonstrate that her methods of parenting Rachel had changed resulted, in substantial part, from her own inaction rather than the lack of sufficient time to make such a demonstration.

¶ 25        Finally, the trial court's determination that respondent-mother had failed to demonstrate that she had made the behavioral changes needed to permit her to properly parent Rachel had ample support in the testimony that the social worker provided at the termination hearing. Among other things, the social worker testified that "[DHS] has not seen any behavioral  changes"; that, "[f]or the 23 months that

[Rachel] has been in foster care, [respondent-mother] only seemed to want to complete the tasks — only complete the tasks of her case plan in the last four months from November up until now" and "has not shown any type of behavioral change"; that there had been "[m]inimal to no efforts to regain custody from [respondent-mother]"; and that DHS remained concerned that the conditions that had led to Rachel's placement in DHS custody had not been adequately addressed. Thus, we hold that the record evidence and the trial court's undisputed findings of fact adequately support the trial court's determination that respondent-mother had not made the behavioral changes necessary to ensure Rachel's safety and welfare by the time of the termination hearing.

¶ 26          After evaluating respondent-mother's challenges to the trial court's findings of fact, we next examine the validity of respondent-mother's challenge to the trial court's conclusion that it was likely that Rachel would be subject to further neglect in the event that she was returned to respondent-mother's care. Among other things, respondent-mother argues that the progress that she had made in satisfying the requirements of her case plan precluded the trial court from determining that there was a likelihood that the neglect to which Rachel had been subjected would be repeated if she was reunited with respondent-mother. We are not persuaded by this argument.

¶ 27          As an initial matter, "a parent's compliance with his or her case plan does not preclude a finding of neglect," *In re J.J.H.*, 376 N.C. at 185, with this Court having held that the neglect to which a child had been subjected was likely to be repeated despite the fact that the parents had substantially complied with their case plans given that the conditions that had led to the child's removal from the parental home continued to exist at the time of the termination hearing. *See id.* at 185–86; *see also In re D.W.P.*, 373 N.C. 327, 339–40 (2020). In addition, this Court has held that a parent's failure to visit with his or her child is indicative of a likelihood of future neglect. *In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113, ¶ 20. After carefully reviewing the record, we hold that the trial court's findings relating to respondent-mother's lack of success in complying with the requirements of her case plan until shortly before the date upon which the termination hearing was held, her failure to show the sustained behavioral changes necessary to eliminate the substance abuse and parenting-related concerns that had led to Rachel's removal from the family home, her failure to consistently visit with Rachel, the cessation of her visits with Rachel in June 2020, and her failure to maintain suitable housing, stable employment, and consistent transportation provide ample support for the trial court's determination that there was a likelihood that Rachel would be subjected to further neglect in the event that she was returned to respondent-mother's care. As a result, the trial court

did not err by concluding that respondent-mother's parental rights in Rachel were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

**B. Dispositional Determination**

Secondly, respondent-mother argues that the trial court erred by concluding that the termination of her parental rights would be in Rachel's best interests. "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage, at which it determines whether terminating the parent's rights is in the juvenile's best interest." *In re A.E.*, 379 N.C. 177, 2021-NCSC-130, ¶ 13 (cleaned up); *see also* N.C.G.S. § 7B-1110(a) (2021). In making the required "best interests" determination,

> [t]he court may consider any evidence . . . that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1)     The age of the juvenile.
>
> (2)     The likelihood of adoption of the juvenile.
>
> (3)     Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)     The bond between the juvenile and the parent.
>
> (5)     The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)     Any relevant consideration.

N.C.G.S. § 7B-1110(a). "We review the trial court's dispositional findings of fact to determine whether they are supported by the evidence received during the termination hearing, with a reviewing court being bound by all uncontested dispositional findings." *In re S.C.C.*, 379 N.C. 303, 2021-NCSC-144, ¶ 22 (cleaned up). "The trial court's assessment of a juvenile's best interests . . . is reviewed for abuse of discretion." *In re E.H.P.*, 372 N.C. at 392. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (cleaned up).

¶ 29     The trial court addressed the required dispositional factors in Finding of Fact No. 33 by stating that

> [Rachel] is approximately 5 years old and doing well in her placement. Even though [Rachel] is not in a pre-adoptive home, the likelihood of adoption is very good. [Rachel] is a very loving little girl, that has no behavioral concerns or other barriers preventing her from being adopted. Her currently [sic] placement is maternal family, that has ultimately decided not to keep [Rachel] long term, but there are two other families already interested in adopting her. Terminating the parental rights of [respondent-mother] . . . would aid in the accomplishment of the permanent plan of adoption for [Rachel]. There is no evidence of any bond between the child and [respondent-mother.]

In addition, the trial court stated in Finding of Fact No. 24 that, even though Rachel's current foster family had decided that it was not interested in keeping her long term,

DHS had identified two families that were interested in having Rachel placed with them. Based upon these findings of fact, the trial court concluded that:

> [i]t is in [Rachel's] best interest that the parental rights of [respondent-mother] . . . be terminated based upon the juvenile's age[]; likelihood of the juvenile being adopted; that termination will help achieve the permanent plan for the juvenile; the lack of bond between the juvenile [and respondent-mother] . . . ; and the quality of the relationship between the juvenile and the placements.

¶ 30       Respondent-mother begins her challenge to the trial court's dispositional decision by contending that the trial court's finding that she had no bond with Rachel lacked sufficient evidentiary support. In support of this argument, respondent-mother directs our attention to the existence of evidence that, in her view, demonstrates the erroneous nature of the relevant finding, including assertions contained in the reports that the guardian ad litem had prepared for use at review and permanency planning hearings dating back to 12 December 2019 that Rachel had expressed the desire to return to respondent-mother's home and that respondent-mother "want[ed] to do everything she [could] to get Rachel back." In addition, respondent-mother points to the social worker's testimony that she had witnessed respondent-mother playing and otherwise engaging with Rachel during visits. In light of this evidence, respondent-mother asserts that the trial court's finding concerning the absence of a bond between herself and Rachel was "inaccurate and

demonstrates a concerning lack of attention to a very important consideration[.]" We are not convinced by respondent-mother's argument.

¶ 31     Admittedly, the reports that the guardian ad litem prepared for use at various permanency planning hearings and the social worker's testimony do not suggest that there had never been a bond between Rachel and respondent-mother. On the other hand, however, neither the relevant reports nor the social worker's testimony tend to show that any such bond continued to exist at the time of the termination hearing. In addition, the record reflects that respondent-mother had last visited with Rachel in March 2020, which was approximately one year prior to the termination hearing; and had not seen Rachel since that time. The report that the guardian ad litem submitted in advance of the termination hearing stated that, while "a bond with [respondent-mother] was observed prior to visitation ceasing[,] . . . given the issues that caused visitations to cease[,] . . . the bond that remains in the [guardian ad litem's] opinion is more of a memory for [Rachel] than a continued bond." In addition, the guardian ad litem's termination hearing report did not suggest that Rachel wanted to return to respondent-mother's home and stated, instead, that the child had expressed excitement about being part of the family in her current placement. As a result, we hold that the record contains sufficient evidence to support the trial court's finding that there was no bond between Rachel and respondent-mother and that, even if the evidence did, in fact, tend to show the continued existence of such a bond,

there is no question but that, as respondent-mother concedes, that bond was "arguably lessened," with the strength of the remaining bond having been unlikely to change the trial court's "best interests" decision in light of the nature and extent of the evidence concerning the remaining dispositional criteria. *See In re Z.L.W.*, 372 N.C. 432, 437 (2019) (explaining that "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a)," with "the trial court [being] permitted to give greater weight to other factors").

¶ 32      Similarly, respondent-mother contends that the trial court's finding that "the likelihood of adoption is very good" lacks sufficient record support. According to respondent-mother, "[t]he only evidence presented tended to show that 'two families are interested,' " with " 'interested' only indicat[ing] a mere possibility, not [a] likelihood." In addition, respondent-mother argues that the trial court failed to fully consider how Rachel's behavioral problems, the lack of a current adoptive placement, and Rachel's ability to connect with a potential placement would impact her adoptability. Once again, we are unable to agree with this aspect of respondent-mother's challenge to the trial court's dispositional decision.

¶ 33      As an initial matter, we note that "the absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." *In re A.J.T.*, 374 N.C. 504, 512 (2020) (citing *In re A.R.A.*, 373 N.C. 190, 200 (2019), and *In re D.H.*, 232 N.C. App. 217, 223 (2014)). In addition, the trial court

specifically addressed the considerations upon which respondent-mother's argument relies by finding that "[Rachel] is a very loving little girl, that has no behavioral concerns or other barriers preventing her from being adopted." A examination of the record satisfies us that this finding and the trial court's determination that "the likelihood of adoption is very good" have ample record support. For example, the social worker testified that "[t]here is a very high likelihood of adoption for [Rachel]" in light of the fact that two families had been identified as being interested in having Rachel live in their home and the fact that Rachel's age would allow her to bond and build a positive relationship with a family. In addition, the social worker asserted that, while Rachel did appear sad and upset at times, the child did not exhibit any extreme behaviors; that Rachel had done well in her current placement; and that Rachel had a good relationship with the family with which she had been placed. Similarly, the guardian ad litem testified that Rachel was "extremely adoptable"; that Rachel was adorable, bright, warm, loving, and emotionally open; and that Rachel connects with other people readily and is easy to talk to. In light of this testimony, respondent-mother's challenge to the sufficiency of the trial court's finding that "the likelihood of adoption was very good" constitutes little more than an impermissible request that we reweigh the record evidence. *See In re R.D.*, 376 N.C. 244, 258 (2020) (explaining that "it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn

from the testimony" and that the trial court's findings of fact "are binding where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary" (cleaned up)). As a result, the trial court did not err by determining that Rachel's "likelihood of adoption is very good."

¶ 34          Finally, respondent-mother contends that dispositional criteria set out in N.C.G.S. § 7B-1110(a) do not suffice to permit the trial court to make a valid "best interests" determination. According to respondent-mother, we should require trial courts to consider additional dispositional factors set out in the statutes that have been adopted in other jurisdictions in determining whether the termination of a parent's parental rights in a child would be in that child's best interests on the grounds that N.C.G.S. § 7B-1110(a) "does not directly address the progress of the parents and how adoption could affect the child, positively or negatively, or even if the child understands the concept of adoption." Respondent-mother's argument to the contrary notwithstanding, however, N.C.G.S. § 7B-1110(a)(6) allows the trial court to consider "[a]ny relevant consideration," with this "catch-all" provision serving to afford the trial court a means to consider any additional relevant information aside from the statutorily-enumerated criteria in the course of making its dispositional decision. To the extent that respondent-mother is seeking to have additional factors added to the list of dispositional criteria enumerated in N.C.G.S. § 7B-1110(a), any such argument should be directed to the General Assembly rather than to this Court.

¶ 35          Moreover, we note that the trial court considered the progress that respondent-mother had made in satisfying the requirements of her case plan and that the effect that adoption would have upon Rachel was considered in the underlying juvenile proceeding despite the fact that the trial court did not make any specific dispositional findings relating to those subjects. As we have already noted, the trial court considered respondent-mother's progress toward satisfying the requirements of her case plan in the course of determining that Rachel was likely to be neglected in the event that she was returned to respondent-mother's care. In addition, the decision that Rachel's primary permanent plan should be set as adoption and that such a result would be consistent with Rachel's health, safety, and best interests, *see* N.C.G.S. § 7B-906.1(g) (2021) (requiring the trial court to "make specific findings as to the best permanent plans to achieve a safe, permanent home for the juvenile within a reasonable period of time"); N.C.G.S. § 7B-906.2(a) (2021) (requiring the trial court to adopt a permanent plan that reflects the juvenile's best interests), provides ample basis for believing that the impact of adoption upon Rachel was clearly considered at some point during the underlying juvenile proceeding. Finally, as we have previously determined, the trial court is not required to consider non-termination-related alternatives at the dispositional stage of a termination hearing, *In re N.B.*, 379 N.C. 441, 2021-NCSCS-154 ¶ 26, and is, instead, simply required to determine whether termination of the parent's parental rights would be in the child's best interests.

¶ 36 Thus, for all of these reasons, we hold that the trial court's dispositional findings have sufficient record support and adequately address the criteria enumerated in N.C.G.S. § 7B-1110(a) and that the trial court did not abuse its discretion in the course of concluding that the termination of respondent-mother's parental rights would be in Rachel's best interests. As a result, since the trial court did not err in concluding that respondent-mother's parental rights in Rachel were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) and that the termination of respondent-mother's parental rights would be in Rachel's best interests, we affirm the trial court's termination order.

AFFIRMED.